
EOD
01/06/2009

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DARYLL W. KING | § | CASE NO. 08-41975 |
| and DANIELLE J. MILLER, | § | (Chapter 7) |
| | § | |
| Debtors. | § | |

## MEMORANDUM OPINION

This matter is before the Court on the Motion to Dismiss filed by the United States Trustee (the "Trustee") pursuant to 11 U.S.C. § 707(b) and FED.R.BANKR.P. 1017(e). The Motion to Dismiss was timely filed and properly served on the Debtors, Daryll W. King and Danielle J. Miller. The Court heard the Motion to Dismiss on November 18, 2008, at which time the parties presented argument and evidence. At the conclusion of the hearing, the Court scheduled the matter for a later ruling. The following constitutes the Court's findings of fact and conclusions of law and disposes of all issues before the Court.

## JURISDICTION

This contested matter arises under 11 U.S.C. § 707(b) and is a core proceeding under 28 U.S.C. § 157(b)(2). This Court, therefore, has jurisdiction to enter a final order pursuant to 28 U.S.C. §§ 157(a) and 1334.

## FACTUAL AND PROCEDURAL BACKGROUND

The Debtors initiated this bankruptcy case by filing a petition for relief under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") on July 30, 2008 (the "Petition Date"). A meeting of creditors was held on September 5, 2008, pursuant to § 341 of the Bankruptcy Code. On October 1, 2008, less than sixty days later, the Trustee filed the Motion to Dismiss. The Debtors opposed the Motion to Dismiss, filing a response on October 13, 2008.

At the hearing on the Motion to Dismiss, Mr. King testified that he was required to relocate from California to Texas in order to keep his job. The Debtors refinanced their home in California in May 2006 and obtained approximately $77,000 in cash. The Debtors used most of this money to pay for moving costs as well as a down payment on a home in Texas. In light of the fact that their California home had been steadily increasing in value and was expected to continue to do so, the Debtors decided to keep the home as an investment. The Debtors intended to sell the California home in or around June 2009, and they planned to use a portion of their equity to pay off debts and to invest the rest into a savings or retirement plan. The Debtors structured the refinanced loan so that they would make interest only payments until they sold the home.

The Debtors closed on a new home in Texas in June 2006. The Debtors purchased the home for $385,000. The home is comprised of 3,407 square feet of living space and, as the Trustee repeatedly pointed out, boasts a swimming pool. The Debtors live in their home with two teenaged boys from a prior marriage of Mr. King as well as an infant who was born after the Debtors moved to Texas. The Debtors pay $3,008 each month for the mortgage, insurance, taxes and homeowners' association fees relating to their Texas home.

In April 2007, the Debtors purchased a new 2007 GMC Yukon as their family vehicle. The monthly payment for the Yukon is $832.00. Mr. King testified that they replaced an older vehicle with the Yukon, and their current monthly payment includes the outstanding loan balance relating to the prior vehicle.

The Debtors used their federal income tax refund to pay the property taxes that came due on their California home in 2007. In addition, the Debtors continued to make monthly, interest-only payments on the California home through May 2008. The Debtors, however, failed to pay the property taxes that came due on their California home in 2008.

2

In May 2008, the holder of the mortgage on the California home paid the property taxes relating to the home as those taxes were past due. The mortgage holder then added the property taxes to the mortgage payment due for June, bringing the total payment due to more than $11,000. The mortgage holder informed the Debtors that their required monthly payments would increase in September 2008 to include interest and principle. By this time, the real estate market had collapsed in San Joaquin County, California, where the Debtors' California home is located, and the Debtors had lost their equity in the home. The Debtors aver that, due to this combination of circumstances, they decided that they could not keep the California home and that their only option was bankruptcy.

The Debtors consulted with a bankruptcy attorney but did not immediately file a bankruptcy petition. In July 2008, prior to the Petition Date, Mr. King purchased a 2008 GMC Sierra truck. Mr. King obtained 0% financing, and the monthly payment relating to the Sierra is $517.00. Mr. King testified that he purchased this vehicle because his job requires him to travel extensively and because his wife and children need a reliable vehicle while he is out of town. Mr. King further testified that their only vehicle at that time, other than the GMC Yukon, was a 1995 pickup truck with significant mechanical problems.

Mr. King testified that he is currently unable to pay all of his monthly bills. He testified that his electricity was cut off the month before the hearing on the Motion to Dismiss. In their response to the Motion to Dismiss, the Debtors stipulated as to certain facts, including the following:

1. The Debtors are individuals.

2. The Debtors have three children, ages 16, 13 and 1.

3. Mr. King is employed as a trainer with GAF Materials, Inc. Ms. Miller is employed by the Law Office of Charles B. Greene. Their combined monthly income is scheduled at $9,645 – or $115,740 if annualized.

4. Mr. King has been employed with the same company since May 2007. Ms. Miller

      has maintained her employment since 2001.

5. The Debtors' tax return for 2007 reflects gross income of approximately $115,000. The Debtors' income appears to be stable.

6. The Debtors' obligations are primarily consumer debts.

7. The Debtors' non-priority, unsecured claims total $672,245. Of this amount, approximately $612,000 is for mortgage debt related to the Debtors' former home in California.

8. The Debtors list their net income at $7,339.72 per month on their Schedule I.

9. The Debtors' Schedule J reflects $7,846.72 in monthly expenses. At the meeting of creditors, the Debtors testified that they had inadvertently failed to schedule an expense of approximately $300 per month related to transportation of Mr. King's sons to California for court-ordered visitation. At trial, Mr. King further testified that his Schedule J does not include a monthly expense of $60 for homeowners' association fees relating to the Debtors' Texas home and that his Schedule J understates his monthly heating and electricity expenses by $230. After making these adjustments, the Debtors would then claim monthly expenses of $8,436.72.

10. In their bankruptcy schedules, the Debtors state their intention to reaffirm their obligations with respect to the GMC Yukon and the GMC Sierra.

## DISCUSSION

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (the "BAPCPA") became fully effective on October 17, 2005. One goal of the BAPCPA was "to address what Congress perceived to be certain abuses of the bankruptcy process. Among the abuses identified by Congress was the easy access to [C]hapter 7 liquidation proceedings by consumer debtors, who if required to file under [C]hapter 13, could afford to pay some dividend to their unsecured creditors." *In re Hardacre,* 338 B.R. 718, 720 (Bankr. N.D. Tex. 2006) (citing 151 CONG. REC. S2459, 2469-70 (Mar. 10, 2005)). "The principal method implemented to steer debtors away from Chapter 7 and into Chapter 13 is the new version of [§] 707," which is usually referred to as the "means test." *In re Singletary,* 354 B.R. 455, 458-59 (Bankr. S.D. Tex. 2006).

Prior to the enactment of the BAPCPA, § 707(b) of the Bankruptcy Code provided for the

dismissal of a case when "the granting of relief would be a substantial abuse of the provisions of this chapter."[1] There was a presumption in favor of granting the relief sought by the debtor (*i.e.*, a discharge), and the burden of proof and production rested on the party seeking dismissal. *See*; COLLIER ON BANKRUPTCY 707.04[5][a] (15th ed. rev. 2006). The BAPCPA altered the circumstances under which a case may be dismissed by removing the "substantial" qualifier and providing for "abuse" to be determined pursuant to either the new § 707(b)(2) or the new § 707(b)(3). When a debtor's disposable income exceeds fixed amounts (*i.e.*, when the debtor fails the "means test"), the new § 707(b)(2) creates a presumption of abuse. When the presumption of abuse does not arise, the new § 707(b)(3) looks to the debtor's intent in filing the bankruptcy petition and the totality of the circumstances to determine abuse.

The present case involves the later type of motion to dismiss. The Trustee contends that the Debtors have an ability to repay a portion of their indebtedness outside of Chapter 7 with reasonable adjustments to their standard of living. Thus, as discussed more fully below, the Trustee argues that this Chapter 7 case should be dismissed because "the totality of the circumstances ... of the [Debtors'] financial situation demonstrates abuse," 11 U.S.C. § 707(b)(3)(B).

### A. Totality of the Circumstances Test

Prior to the enactment of the BAPCPA, many courts, including this Court, employed a

---

1 Section 707(b) was one of several consumer credit amendments added to the Bankruptcy Code in 1984. Congress had two reasons for originally enacting § 707(b):

First, it wanted to address the problem of consumer debtors taking inordinate advantage of modern easy-credit practices, running up consumer debt, and then seeking discharge of that debt through Chapter 7 bankruptcy. Congress apparently felt § 707(b) would remedy the problem of consumer debtors unfairly taking advantage of Chapter 7 even though they are able over time to pay off their debts. Second, Congress wanted to give the courts a specific mechanism to more readily dismiss petitions by abusive consumer debtors. As the bankruptcy court aptly noted, § 707(b) was not enacted to narrow and discourage court review of abuse cases to those involving consumer debt, but to broaden and encourage such review in light of the fact many bankruptcy courts were not dismissing abusive consumer petitions.

"totality of the circumstances" standard for determining whether to dismiss a debtor's Chapter 7 proceeding based on "substantial abuse." *See, e.g., In re Cortez*, 457 F.3d 448 (5th Cir. 2006); *In re Faulhaber*, 243 B.R. 281, 284 (Bankr. E.D. Tex. 1999). Although Congress has altered the standard for dismissal in changing the test from "substantial abuse" to "abuse," pre-BAPCPA cases which consider whether a case should be dismissed for substantial abuse remain instructive in an analysis under § 707(b)(3). *See, e.g., In re Singletary,* 354 B.R. at 461-62 (describing § 707(b)(3) as a codification, and clarification, of the pre-BAPCPA standard under § 707(b)); *In re dePellegrini,* 365 B.R. 830, 832 (Bankr. S.D. Ohio 2007) (finding that pre-BAPCPA cases are still instructive under § 707(b)(3)). More particularly, "[b]ecause Congress retained the phrase 'totality of the circumstances' in BAPCPA, the Court concludes that it may look to pre-BAPCPA case law to construe the meaning of that phrase under [§] 707(b)(3)." *In re Pfiefer,* 365 B.R. 187, 191 (Bankr. D. Mont. 2007).

Turning to the circumstances relevant to the determination of whether grounds exist to dismiss a bankruptcy under § 707(b), courts have considered the following factors:

1. Whether the debtor could pay a substantial portion of his debts from future income in a hypothetical Chapter 13 case;

2. Whether the bankruptcy petition was filed due to sudden illness, calamity, disability, or unemployment;

3. Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;

4. Whether the debtor's proposed family budget is reasonable;

5. Whether the debtor is seeking to reaffirm a large amount of secured debt to the detriment of unsecured creditors;

6. Whether the debtor's schedules and statement of current income and expenses

---

*Stewart v. United States Trustee (In re Stewart),* 175 F.3d 796, 812-13 (10th Cir. 1999) (citations omitted).

  reasonably and accurately reflect his true financial condition;

7. Whether the debtor has a stable source of income;

8. Whether the debtor is eligible to file a Chapter 13 case;

9. Whether there are state remedies or private negotiations that the debtor can invoke to ease his financial predicament;

10. Whether the debtor's expenses can be reduced without depriving the debtor of basic necessities; and

11. Whether the petition was filed in good faith.

*See In re Kelly*, 841 F.2d 908, 914-915 (9th Cir. 1988) (adopting an "ability to pay" test for substantial abuse); *In re Green*, 934 F.2d 568, 572 (4th Cir. 1991) (adopting a "totality of the circumstances" test for substantial abuse); *In re Krohn*, 886 F.2d 123, 126-127 (6th Cir. 1989) (adopting a "totality of the circumstances" test for substantial abuse). *See also In re Cortez,* 457 F.3d 448, 456 (5th Cir. 2006) (applying a totality of the circumstances test for substantial abuse); *In re Walton*, 866 F.2d 981, 984-985 (8th Cir. 1989) (following the Ninth Circuit's reasoning in *Kelly*); *In re Fitzgerald*, 155 B.R. 711, 716 (Bankr. W.D. Tex. 1993) (agreeing with *Kelly* that the primary focus of the court's inquiry should be a debtor's ability to pay); *In re Watkins*, 216 B.R. 394 (Bankr. W.D. Tex. 1994) (adopting the "totality of the circumstances" test with an emphasis on ability to repay).

  Following the changes to § 707(b), bankruptcy courts have observed that persons, such as the Debtors in this case, with substantial and stable employment "will be hard pressed to establish that they do not have the ability to pay some of their unsecured debt, such as through funding a Chapter 13 plan of reorganization." *In re Wadsworth,* 383 B.R. 330, 333-34 (Bankr. N.D. Ohio 2007). However, § 707(b)(3) does not automatically preclude debtors with substantial financial means from obtaining relief under Chapter 7 of the Bankruptcy Code. Unlike the "means test" of § 707(b)(2),

7

which is inherently objective, an analysis under § 707(b)(3) is subjective, requiring that a court conduct a case-by-case examination of a debtor's financial situation and course of conduct. *See In re Wilson,* 356 B.R. 114, 121 (Bankr. D. Del. 2006).

### B. Application to this Case

The starting point in any § 707(b) analysis centers on the conditions as they existed at the time the petition is filed. *See In re Pier,* 310 B.R. 347, 354-55 (Bankr. N.D. Ohio 2004). Section 707(b)(2) is utilized to determine whether there is a presumption of abuse by the filing of a Chapter 7 petition by a debtor with above-median income. 11 U.S.C. § 707(b). The presumption of abuse is determined on a "snapshot" basis as of the petition date. Even if a presumption of abuse does not arise, a Chapter 7 petition may be found abusive based on the "totality of the circumstances." 11 U.S.C. § 707(b)(3)(B). Accordingly, although deductions for secured debt payments item would be allowed in determining whether an evidentiary presumption arose, the payments may still be considered in determining whether granting Chapter 7 relief is, in fact, abusive. *In re Gonzalez,* 388 B.R. 292, 302 n. 5 (Bankr. S.D. Tex. 2008). The Court "must consider the debtor's financial condition at the time of the hearing on the motion to dismiss in determining whether granting Chapter 7 relief is an abuse under [§] 707(b)(3)." *In re Pennington,* 348 B.R. 647 (Bankr. D. Del. 2006). *See also In re Cortez,* 457 F.3d at 457-458 (in a § 707(b) action, bankruptcy court can and should consider post-petition events).

Here, as a preliminary matter, there is no question as to whether the Debtors filed their bankruptcy petition in good faith. The Trustee opened his trial presentation by stating that he is not contending that the Debtors initiated this case in bad faith. Rather, the Trustee requests the Court to dismiss this case pursuant to § 707(b)(3)(B) because he contends that the totality of the circumstances demonstrates abuse.

In particular, at the hearing on the Motion to Dismiss, the Trustee sought to establish that the Debtors would be able to pay their creditors in a hypothetical Chapter 11 or Chapter 13 case by reducing their monthly expenses. The Trustee pointed out that the Debtors' monthly expenses for their home (which total $3,008) and their car loans (which total $1,349) exceed the IRS Local Standards for housing and transportation expenses. The Trustee contended that the Debtors reasonable expenses are no more than $6,720, leaving $619 a month for payment to creditors.

This Court rejects a bright line test setting caps on housing or transportation expenses based on the IRS Local Standards. Congress adopted a totality standard in § 707(b)(3)(B), and bankruptcy courts must consider the totality of the circumstances when deciding whether expenses above the standard allowed expenses are reasonably necessary. In this case, the Court finds and concludes that the Debtors' total expenses, including the mortgage and car expenses at issue, are excessive when compared to the Debtors' income. *Cf: In re Nissly,* 266 B.R. 717, 720 (Bankr. N.D. Iowa 2001) (denying confirmation where debtors' housing expenses exceeded 20% of their monthly income); *In re Kitson,* 65 B.R. 615, 616 (Bankr. E.D. N.C. 1986) (denying confirmation of a plan that devoted 27% of debtor's income to housing expenses); *In re Baird,* 2005 WL 612863 at *2 (Bankr .N.D. Iowa Mar. 10, 2005) (denying confirmation where a plan devoted 28% of debtors' monthly income to their mortgage payment). The Debtors' current monthly living expenses, which do not include expenses relating to the California home, exceed their income. It appears to the Court that these expenses could be materially reduced without depriving them or their dependents of adequate food, clothing, shelter or other necessities. The Debtors' failure to rein in their expenses mitigates strongly against affording them relief under Chapter 7 of the Bankruptcy Code.

The Court acknowledges that in the current financial climate, numerous sellers have suffered a loss in the sale of homes once believed to have held equity. The Court also recognizes that under

certain circumstances, such as a job transfer, a family might find itself in the unenviable position of supporting two mortgages. In this case, however, the Debtors were not forced to carry two large mortgages due to market conditions or an inability to sell their California home when they moved to Texas. The Debtors made a conscious decision to keep the California home as an investment. The Debtors were carrying two mortgages at the time they incurred a significant, additional monthly obligation for the purchase of a new GMC Yukon. Less than a month before the Petition Date, the Debtors incurred another significant, additional monthly obligation for the purchase of a new GMC Sierra truck. If the Debtors were acting in good faith, as the parties agree, then surely they thought their budget would support two new cars. Now that the Debtors have relinquished the California home, there must be some room in their budget to pay unsecured creditors. In short, it appears to the Court that the Debtors have the ability to pay a substantial portion of their debts from future income in a hypothetical Chapter 11 or 13 case with some good, old-fashioned belt-tightening.

Other factors support dismissal as well. This bankruptcy case was not the result of calamity, illness or disability. The Debtors have a stable source of income. The Debtors' financial problems were caused by living beyond their means. Moreover, although their current monthly expenses exceed their income, the Debtors are seeking to reaffirm a large amount of secured debt to the detriment of their unsecured creditors. For these and all the foregoing reasons, the Court concludes that "the totality of the circumstances … of the [Debtors'] financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3)(B).

In reaching this conclusion, the Court considered the fact that a central function of bankruptcy law is to afford a debtor a fresh start. *See Local Loan Co. v. Hunt,* 292 U.S. 234, 244 (1934). At the same time, this policy may be, and sometimes is, subordinated to other policy concerns. For example, Congress has determined that certain types of debts are not subject to the

fresh start. *See* 11 U.S.C. § 523(a) (listing non-dischargeable debts). Similarly, certain types of acts may bar a debtor from even receiving a discharge. *See* 11 U.S.C. § 727(a) (setting grounds for denial of discharge). Section 707(b) continues along this same line. In enacting § 707(b), Congress determined that certain debtors -- for example, those with the ability to repay their debts or those debtors who filed their petition in bad faith -- should not be afforded the benefits of an immediate fresh start under Chapter 7, but, instead, should have their fresh start conditioned on the repayment of at least a portion of their unsecured debts.

## CONCLUSION

For all of the foregoing reasons, the Court concludes that the Trustee has established by a preponderance of the evidence that allowing these Debtors to continue in a Chapter 7 proceeding would be an abuse of the bankruptcy system. The Debtors have been living beyond their means, and the totality of the monthly expenses reported by the Debtors does not reflect any belt-tightening. The Debtors likewise do not appear to have prioritized their expenses to fit within their monthly income. The Debtors have not, for example, reduced certain expenses so that they can afford others. Instead, they seem to want to have it all. The Debtors enjoy a stable income and good health, and their creditors should not be forced to bear the burden of maintaining the same lifestyle that precipitated this bankruptcy. An order will be entered dismissing the Debtors' bankruptcy petition provided, however, that the Debtors will be given thirty days to convert this case to a case under Chapter 11 or Chapter 13 if they so desire.

Signed on 01/06/2009

*Brenda T. Rhoades*      SR
HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE